

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-13-1996

# Artway v. Atty Gen NJ

Precedential or Non-Precedential:

Docket 95-5157,95-5194,95-5195

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Artway v. Atty Gen NJ" (1996). *1996 Decisions.* Paper 165.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/165

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

NOS. 95-5157, 95-5194 and 95-5195
_____

ALEXANDER A. ARTWAY

v.

THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY;
CHIEF OF POLICE OF WOODBRIDGE TOWNSHIP, NEW JERSEY;
THE SUPERINTENDENT OF THE NEW JERSEY STATE POLICE

<u>Attorney General of New Jersey and Superintendent
of the New Jersey State Police, Appellants in No. 95-5157</u>

_____

ALEXANDER A. ARTWAY

v.

THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY;
CHIEF OF POLICE OF WOODBRIDGE TOWNSHIP, NEW JERSEY;
THE SUPERINTENDENT OF NEW JERSEY STATE POLICE

<u>Chief of Police of Woodbridge Township, New Jersey
Appellant in No. 95-5194</u>

_____

ALEXANDER A. ARTWAY

v.

THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY;
CHIEF OF POLICE OF WOODBRIDGE TOWNSHIP, NEW JERSEY;
THE SUPERINTENDENT OF NEW JERSEY STATE POLICE

<u>Alexander A. Artway, Appellant in No. 95-5195</u>

(Civ. No. 94-cv-06287)
_____

**Present:** SLOVITER, <u>Chief</u> <u>Judge</u>, BECKER, STAPLETON,
MANSMANN, GREENBERG, SCIRICA, COWEN, NYGAARD,
ALITO, ROTH, LEWIS, McKEE, and SAROKIN, <u>Circuit</u> <u>Judges</u>,

1

and SHADUR, <u>District Judge</u>.[1]

_____

**SUR PETITION FOR PANEL REHEARING
WITH SUGGESTION FOR REHEARING IN BANC**
_____

The petitions for rehearing filed by Alexander Artway in No. 95-5195 and by the Attorney General of New Jersey and the Superintendent of the New Jersey State Police in Nos. 95-5157, 95-5194 and 95-5195 having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges in active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is DENIED. Judges Greenberg, Nygaard, Alito, and Sarokin would grant rehearing. Judge Alito's dissenting opinion sur denial of rehearing is attached.

BY THE COURT:


/s/ Edward R. Becker
    Circuit Judge

DATED: May 13, 1996

_____

[1]As to panel rehearing only.

2

OPINION SUR DENIAL OF REHEARING

<u>Artway v. Attorney General of the State of New Jersey</u>
Nos. 95-5157, 95-5194 and 95-5195

Alito, <u>Circuit Judge</u>:


This case should be reheard by the full court. Rehearing in banc is appropriate when a case "involves a question of exceptional importance," Fed. R. App. Pr. 35(a), and the constitutionality of the community notification provisions of Megan's Law indisputably meets this standard. This question is obviously important for those, such as Alexander Artway, who may be subject to these requirements. It is also of enormous importance to children like Megan Kanka, after whom the law was named, and to their parents.

Seven-year-old Megan Kanka disappeared near her home on a summer day in 1994. She was last seen talking to a next-door neighbor, Jesse Timmendequas. The next day Timmendequas was arrested and confessed that he had lured Megan into his home by promising to show her a puppy. According to his confession, he then raped and killed her. Only after Timmendequas's arrest did Megan's parents learn that he was a multiple sex offender, that he had assaulted and nearly killed another young girl in 1982, and that the other two men with whom he was sharing the house were also convicted sex offenders whom he had met while incarcerated.

These events and other similar offenses prompted the New Jersey Legislature to enact the community notification

provisions that are at issue in this appeal. Similar laws have been enacted by other states, and related legislation has been passed at the federal level. The constitutionality of the New Jersey provisions has been upheld by the New Jersey Supreme Court. Doe v. Poritz, 142 N.J. 1, 662 A.2d 367 (1995). However, the panel's decision in this case may well result in the invalidation of these provisions. Following the panel's decision, the United States District Court for the District of New Jersey enjoined state officials from complying with them. The denial of rehearing in this case means of course that, absent some intervening action by the Supreme Court, the panel's decision will control subsequent proceedings in the district court and before panels of our court until another occasion for in banc review arises. In the meantime, a law that was enacted by the New Jersey Legislature to deal with what it viewed as a grave and imminent threat will remain in constitutional limbo and may go unenforced. I find this prospect unacceptable.

Whether the community notification provisions of Megan's Law comport with the Ex Post Facto Clause is not an easy question. The panel opinion's discussion of this question is thoughtful and scholarly, and its effort to develop a grand unified theory of "punishment" under the Double Jeopardy, Excessive Fines, and Ex Post Facto Clauses is ambitious. I have serious doubts, however, concerning critical portions of the panel's analysis. I am particularly troubled by the panel's conclusion that a measure may constitute "punishment" if its "effects" or "negative repercussions -- regardless of how they

2

are justified -- are great enough." Op. at 53, 59. I am doubtful that it is possible to determine that a measure constitutes punishment based solely on its effects. Moreover, I am convinced that the panel has misinterpreted California Department of Corrections v. Morales, 115 S.Ct. 1597 (1995), the precedent on which the panel's effects test is based.

Is it possible to conclude that a measure constitutes "punishment" based solely on its effects or "sting"? It is certainly not possible to conclude that a governmental action is non-punitive based on its mild effects. (Even a mild criminal sentence -- for example, ordering a defendant to pick up litter in the park on a beautiful spring day -- is unquestionably punishment.) Is it nevertheless possible to determine that a measure constitutes "punishment" based on its harsh effects? I am skeptical. It is settled that certain governmental actions having severe effects are not "punishment." For instance, pretrial detention, though sometimes quite harsh, is "regulatory, not penal." United States v. Salerno, 481 U.S. 739 (1987). So is the revocation of a professional or occupational license, Hawker v. New York, 170 U.S. 189 1898), or the termination of Social Security benefits. Fleming v. Nestor, 363 U.S. 603 (1960), even though the effects of these actions can be devastating. It is also settled that deportation, "however severe its consequences," does not implicate the Ex Post Facto Clause. Harisiades v. Shaughnessy, 342 U.S. 580, 594 (1952) (emphasis added). See also, e.g., INS v. Lopez-Mendoza, 468 U.S. 1032, 1038 (1984); Mahler v. Eby, 264 U.S. 32, 39 (1924) ("It is

3

well settled that deportation, while it may be burdensome and severe for the alien, is not punishment."). In view of these precedents, I have grave doubts whether the panel is correct that a measure may be held to constitute "punishment" under the Ex Post Facto Clause simply because its "negative repercussions -- regardless of how they are justified -- are great enough." Artway, supra, slip op. at 59.

Moreover, I am convinced that the panel's effects test, whatever else may be said in its favor, is not supported by the Supreme Court's decision in Morales. I see no evidence whatsoever that Morales was meant to adopt the far-reaching proposition that a measure may be held to constitute "punishment" for ex post facto purposes based solely on its effects. Certainly the Court's opinion does not expressly embrace any such broad proposition, and I think the best reading of the opinion is a much narrower one.

Morales concerned a 1981 California statutory amendment regarding eligibility for parole hearings. Morales had twice been convicted of murder, first in 1971 for killing his girlfriend and then in 1980 for killing and dismembering an elderly woman who had befriended him while he was in prison and who had married him after he was paroled. 115 S.Ct. at 1599-1600. Under the law in effect at the time of his 1980 conviction, he would have been entitled to a parole hearing every year beginning in 1989. Id. at 1600. The 1981 amendment, however, permitted the Board of Prison Terms to defer hearings for up to three years under certain limited circumstances, viz.,

4

if a prisoner had been convicted of more than one offense involving the taking of a life and if the Board found that it was not reasonable to expect that parole would be granted during the intervening years. <u>Id</u>. In denying Morales parole in 1989, the Board found that he satisfied these criteria and thus deferred his next hearing for three years. <u>Id</u>.

Morales argued that the application to him of the 1981 amendment violated the Ex Post Facto Clause, and he "relie[d] chiefly on a trilogy of cases holding that a legislature may not stiffen the `standard of punishment' applicable to crimes that have already been committed. See <u>Lindsey v. Washington</u>, 301 U.S. 423 . . . (1937); <u>Miller v. Florida</u>, 482 U.S. 423 . . . (1987); <u>Weaver v. Graham</u>, 450 U.S. 24 . . . (1981)." <u>Morales</u>, 115 S.Ct. at 1601. The Supreme Court, however, distinguished these cases on the ground that they involved laws that "had the purpose and effect of enhancing the range of available prison terms," whereas the amendment at issue in <u>Morales</u> "simply `alter[ed] the method to be followed in fixing a parole release date under identical substantive standards.'" <u>Id</u>. at 1602 (citations omitted).[2]

The Court then rejected Morales' argument that "the <u>Ex Post Facto</u> Clause forbids any legislative change that has any

---

[2]The Court expressly disavowed <u>Lindsey</u>, <u>Weaver</u>, and <u>Miller</u> to the extent those decisions "suggested that enhancements to the measure of criminal punishment fall within the ex post facto prohibition because they operate to the `disadvantage' of covered offenders." <u>Id</u>. at 1602 n.3 (citations omitted). And the opinion stressed that "the focus of the ex post facto inquiry is not on whether a legislative change produces some ambiguous sort of `disadvantage,' . . . but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable." <u>Id</u>.

conceivable risk of affecting a prisoner's punishment." 115 S.Ct. at 1602. The Court noted that this argument would require invalidation of "any of a number of minor (and perhaps inevitable) mechanical changes that might produce some remote risk of impact on a prisoner's expected term of confinement," "including such innocuous adjustments as changes to the membership of the Board of Prison Terms, restrictions on the hours that prisoners may use the prison law library, reductions to the duration of the parole hearing, restrictions on the time allotted for a convicted defendant's right of allocution before a sentencing judge, and page limitations on a defendant's objections to presentence reports or on documents seeking a pardon from the governor." Id. at 1603. It was in this context that the Court wrote that "the question of what legislative adjustments `will be held to be of sufficient moment to transgress the constitutional prohibition' must be a matter of `degree.'" Id. (emphasis in original) (quoting Beazell v. Ohio, 269 U.S. 167, 171 (1925)). The Court then concluded that the 1981 California amendment created "only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes" and that "such conjectural effects" were "insufficient" to establish an ex post facto violation. Id.

I do not interpret Morales as standing for the sweeping proposition that any measure may be held to constitute "punishment" under the Ex Post Facto Clause based solely on its effects. Rather, I think that Morales is a narrow decision that

6

means only that when a measure does not retrospectively "change the sentencing range" applicable to a particular offense (115 S.Ct. at 1602) but does make procedural or other changes that may indirectly affect the length of time that a prisoner may serve, no violation of the Ex Post Clause will be found if the possibility of such an indirect effect is "speculative and conjectural." 115 S.Ct. at 1603. <u>Morales</u> does stand for the proposition that the "effects" of a challenged measure are significant within this narrow context, but I do not think that it is correct to read <u>Morales</u> as adopting a universally applicable effects test. It is telling, I think, that <u>Morales</u> was not even cited in the excellent briefs filed on behalf of Artway and his supporting amicus, the American Civil Liberties Union of New Jersey.

The panel's effects test is especially troubling because it encompasses not only the direct effects of the community notification provisions but also what may be called their secondary effects, that is, the effects on released sex offenders of actions taken by private citizens who are in turn affected by community notification. I doubt whether any reasonably accurate assessment of the likely secondary effects of community notification will be possible unless implementation of these provisions is permitted in New Jersey or elsewhere in a sufficiently large sample of cases over a sufficiently extended period of time. As the panel itself seems to recognize, however, the constitutionality of these provisions is likely to be settled by the first batch of pre-enforcement challenges. See Op. at 22

7

n.9.  At that point, it is doubtful that there will be an adequate empirical basis for determining what the probable long term effects of community notification will be.  What we are likely to see, I fear, are district court "findings" based on bits of evidence that really prove little about the likely effects over the long term of a program of community notification.  This is a most unedifying prospect.

For these reasons, I disagree with the court's refusal to rehear this case in banc.  Judge Greenberg and Judge Nygaard join in this opinion.